# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

December 19, 2014

Lyle W. Cayce
Clerk

---

13-10899

---

BEATRICE LUNA, Individually and as Representative of the Estate of Israel Leija, Jr.; CHRISTINA MARIE FLORES, as Next Friend of J.L. and J.L., Minor Children,

                                 Plaintiffs - Appellees

v.

CHADRIN LEE MULLENIX, In His Individual Capacity,

                                 Defendant - Appellant

---

Appeal from the United States District Court for the
Northern District of Texas, Amarillo

---

## ON PETITION FOR REHEARING EN BANC

(Opinion August 28, 2014, 765 F.3d 531)

Before KING, HAYNES, and GRAVES, Circuit Judges.

PER CURIAM:

      Treating the petition for rehearing en banc as a petition for panel rehearing, the petition for panel rehearing is DENIED. The court having been polled at the request of one of its members, and a majority of the judges who are in regular active service and not disqualified not having voted in favor (FED. R. APP. P. 35 and 5TH CIR. R. 35), the petition for rehearing en banc is DENIED.

In the en banc poll, 6 judges voted in favor of rehearing (Judges Jolly, Davis, Jones, Smith, Clement, and Owen), and 9 judges voted against rehearing (Chief Judge Stewart and Judges Dennis, Prado, Elrod, Southwick, Haynes, Graves, Higginson, and Costa).

ENTERED FOR THE COURT:

/s/ James E. Graves, Jr.
JAMES E. GRAVES, JR.
United States Circuit Judge

E. GRADY JOLLY, Circuit Judge, dissenting from the Denial of Rehearing En Banc, joined by KING, DAVIS, JONES, SMITH, CLEMENT and OWEN, Circuit Judges:

Certainly, I have great personal respect for all members of the instant panel. But, I will be candid: My impression is that the panel majority either does not understand the concept of qualified immunity or, in defiance thereof, impulsively determines the "right outcome" and constructs an opinion to support its subjective judgments, which necessarily must ignore the concept and precedents of qualified immunity.

The concept of qualified immunity assumes that law enforcement officers want to respect the constitutional rights of citizens who violate the law or are suspected of violating the law. *Accord Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2085 (2011) ("Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments" and "protects all but the plainly incompetent or those who knowingly violate the law." (internal quotation marks and citation omitted)). For an officer to respect those constitutional rights, he must know or have reasonable understanding of what the legal

standards are that govern his conduct. *Presley v. City of Benbrook*, 4 F.3d 405, 409 (5th Cir. 1993) ("[T]he essence of qualified immunity [is] that an officer may make mistakes that infringe constitutional rights and yet not be held liable where, given unclear law or uncertain circumstances, it cannot be said that she knew she was violating a person's rights."). The only means for an officer to have that understanding is by notice of the law through the decisions of the courts. Officers cannot be held liable for a violation of legal standards when there are three or four versions of the law applicable to judging the officers' decisions and responses to criminal suspects, arrestees, or those committing crimes. *McClendon v. City of Columbia*, 305 F.3d 314, 332 (5th Cir. 2002) (en banc) (Qualified immunity must be granted "if a reasonable official would be left uncertain of the law's application to the facts confronting him."); *Del A. v. Edwards*, 855 F.2d 1148, 1150 (5th Cir. 1988) ("When the law is unclear . . . the official . . . require[s] protection [in the form of qualified immunity] so that fear of suit will not cloud the decision-making process."). Consequently, the constitutional law must be clearly established so as to provide reasonable notice of an officer's duties to citizens. To give such required notice, the right at issue cannot be defined at a high level of generality if it is to have any meaning that serves the purpose of qualified immunity. *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (warning that "if the test of 'clearly established law' were to be applied at [a high] level of generality, it would bear no relationship to the 'objective legal reasonableness' that is the touchstone of [qualified immunity and plaintiffs] . . . would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights."). Furthermore, qualified immunity recognizes that, even where constitutional rights are clearly established, an officer should not be liable for his conduct unless his conduct was unreasonable in the light of the clearly established law. *Accord*

*Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) ("Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted.").

The initial task here is to define the clearly established law that governs the specific facts of this case. If such law cannot reasonably be defined, the inquiry ends, and the officer is not liable because he had no notice of the rights that he was bound to respect. If there is clearly established law, the qualified immunity analysis then asks: given the factual situation the officer confronted, was his conduct unreasonable in the light of the clearly established law of which he reasonably had notice. This final question acknowledges that, on some occasions, the safety of the public or the safety of the officers and the safety of surrounding lives is so at risk that the officer must make a snap judgment that requires him to act notwithstanding the lapidary principles of the law at issue.

The panel majority regrettably has demonstrated its lack of grasp of these qualified-immunity principles in fundamental ways and has done so from the beginning of its efforts to decide this case, through its present unexplained and puzzling reversal of positions:

- At the outset, the majority was doggedly determined to send this case to a jury against all precedent and notwithstanding Judge King's clear—and unanswered—dissent. My impression is confirmed by the evolution of the majority's approach from its earlier opinion[1] to today's substitute. In the first version, the majority holds that a jury is needed to determine whether Mullenix's conduct was reasonable under the Fourth Amendment. In its new opinion, the majority nods to the need for a jury, but it proceeds to hold that not one of the facts supporting Mullenix's

---

[1] *Luna v. Mullenix*, 765 F.3d 531 (5th Cir. 2014), vacated and replaced by *Luna v. Mullenix*, --- F.3d ---- (5th Cir. 2014).

decision to disable Leija's car to prevent his continued threat to the police and the public is legally sufficient to render the shooting objectively reasonable under the Fourth Amendment. The panel's complete turnaround of its earlier dogmatic assertions, with no explanation, leaves the bench and bar to wonder: What is going on here? The confusing nature and unorthodox analysis of the opinion—both initially and on rehearing—will surely befuddle all readers; not the least, those officers who consider themselves familiar with the clearly established law of the Supreme Court and this Court.[2]

- The majority fails to recite or accept the clearly established law that applies to car-chase cases, and then dismissively states, "We need not dwell on this issue." "Dwelling" would have led to objective analysis of the relevant standard, articulated by the U.S. Supreme Court in *Scott v. Harris*, 550 U.S. 372, 386 (2007) (holding in clear, easily understood language, "A police officer's attempt to terminate a dangerous high-speed car chase that threatens the lives of innocent bystanders does not violate the Fourth Amendment, even when it places the fleeing motorist at risk of serious injury or death.").[3]

- The majority irrationally concludes that Trooper Mullenix's conduct was unreasonable—based on its own, subjective predilections, supported by arguments made of straw; in particular, that tire spikes should have been the preferred alternative means for stopping Leija's car.

---

[2] Given the majority's conclusions on rehearing, it is hard to see what issues remain other than damages and attorney's fees. The majority moved from improperly committing a question of law to the jury to rendering, in essence, an unprecedented liability verdict against Mullenix. The majority's subjective view of the case is clear, but its legal analysis remains, at best, cloudy.

[3] *See also Pasco ex rel. Pasco v. Knoblauch*, 566 F.3d 572, 581 (5th Cir. 2009) ("Stuck between the choice of letting a presumptively intoxicated and reckless driver continue unabated or bumping the suspect off the road, [the officer] chose the course of action that would potentially save the lives of individuals who had no part in creating the danger. Although this choice ended tragically with [the driver's] death, the balancing test indicates that [the officer's] actions were reasonable.").

- The majority fails to heed the Supreme Court's instruction to account for Leija's culpability.[4]  It was Leija, after all, who placed himself and the public in danger when he fled arrest while intoxicated, traveled at excessive speeds for miles and miles, threatened to shoot officers in pursuit, and swerved around numerous vehicles.  It was Leija's choices and actions—not Mullenix's—that led to his demise.  Leija put innocent lives at risk; Mullenix responded and tried to restore public safety.  The majority ignores Leija's culpability, making him an innocuous actor rather than a man bent on escape at all costs.[5]

- The majority views the facts of this case through hindsight, substituting its own notions for controlling precedent.  In the Delphic milieu of an appellate court, the majority condemns Mullenix for his real-time decision to shoot at the car's engine block and proceeds to challenge his judgment for not waiting to see what, if any, effect the tire spikes might have on Leija's flight.  In so doing, the majority fails to give Mullenix "breathing room to make reasonable but mistaken judgments" and, in so doing, strips him of the qualified immunity to which he is entitled.[6]

- The majority demonstrates a lack of understanding of qualified immunity and its purpose as set out by the Supreme Court:  to "protect officers from the sometimes 'hazy border between excessive and acceptable force,' " especially when—as here, because the majority refused to accept the clearly established law governing car chases— officers lack notice that their conduct is clearly established as unconstitutional.[7]  *See Carroll v. Carman*, 135 S. Ct. 348, 350 (2014)

---

[4] *See Scott*, 550 U.S. at 384 (stating that a court should "take into account not only the number of lives at risk, but also their relative culpability"; *id.* ("It was respondent, after all, who intentionally placed himself and the public in danger by unlawfully engaging in the reckless, high-speed flight that ultimately produced the choice between two evils that [the officer] confronted.").

[5] *Id.* ("We have little difficulty in concluding it was reasonable for [the officer] to take the action that he did.").

[6] *Carroll v. Carman*, 135 S. Ct. 348, 350 (2014) (quotation marks omitted).

[7] *Saucier v. Katz*, 533 U.S. 194, 206 (2001) ("Qualified immunity operates . . . to protect officers from the sometimes 'hazy border between excessive and acceptable force,' and to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." (citation omitted)), *overruled in part by Pearson v. Callahan*, 555 U.S. 223 (2009).

("[E]xisting precedent must have placed the statutory or constitutional question *beyond debate*." (quotation marks omitted) (emphasis added)).

- As noted, the majority creates a phantom argument based on no record fact of any kind: that Mullenix chose "deadly force" when shooting at Leija's engine instead of choosing an alternate, non-deadly means for stopping the car. Even though the record does not begin to suggest, which alternative—bullets to the engine block or spikes to the tires— would have been less likely to produce a deadly result, the majority assumes an avuncular role and subjectively concludes, without any record support, that the tire spikes would have been the better choice. It then relies solely on that appellate post hoc unsupported opinion for its mantra that Mullenix made an unwise choice. Even more perfidious to the record, the majority repeats that Mullenix's plan was to shoot Leija himself. There was never such a plan. The plan was to shoot the engine block of the car. This unsupported, made up, shoot-to-kill "fact" reflects the reckless, unwarranted liberties that the majority takes to reach its predetermined "right result."

To comprehend how far the panel majority drifts from understanding that it is the *plaintiffs' burden* to show that Mullenix is *not* entitled to qualified immunity, one must only consider the undisputed facts that the majority attempted to avoid or to mitigate in its initial opinion and, now exposed, attempts to dismiss as inconsequential:

- Equipped with a warrant, an officer attempted to effect Leija's arrest at a Sonic Drive-In in Tulia, Texas.

- Rather than submit to that arrest, Leija fled in his car at speeds up to 110 mph.

- His flight lasted approximately eighteen minutes and covered more than twenty-five miles of interstate, plus some distance over city streets in Tulia, Texas.

- Leija's flight took him past ten interstate on-ramps.

- Leija sped at times down the center of the road, with his car straddling the left and right lanes; he swerved between lanes; and he changed lanes without using his blinker.

- Leija raced past eight vehicles in the northbound lane of the interstate: four passenger vehicles, one bus, two tractor trailers, and one truck carrying a large trailer. Some of these vehicles were in the right-hand lane as Leija sped past; others were partially on the right shoulder, waiting for Leija to race by them. There were more than fifty cars in the southbound lane of the interstate. Many of these vehicles had to pull off the road to escape Leija's path.

- Leija plausibly was believed to be intoxicated.

- During the high-speed chase, Leija called the police dispatch officer two times. Both times, Leija said that he had a gun and that he would shoot any officer he saw if law enforcement did not stop its pursuit. The dispatch officer relayed these threats to the pursing officers, including Trooper Mullenix.

- Leija was rapidly approaching Officer Ducheneaux, Trooper Mullenix, and other officers on the scene.

- Leija's car, gun, and intoxication posed risks to Officer Ducheneaux, who was setting up tire spikes near Trooper Mullenix's location.

- Leija's gun and intoxication posed risks to Troopers Rodriguez, who was in the chase car, and Mullenix, who was exposed on the bridge.

- Mullenix intended to shoot down at Leija's car as it approached, hoping that he could use his rifle to take out the car's engine block.

- Trooper Mullenix relayed his plan to disable Leija's car to the driver of the chase car, Trooper Rodriguez. Rodriguez responded, "10-4."

- Mullenix also had a brief conversation with a deputy about whether Mullenix could disable Leija's car by shooting it and how and where to shoot the car to best accomplish disabling it.

- When he fired his weapon, Trooper Mullenix knew (1) a warrant was issued for Leija's arrest, (2) Leija was fleeing arrest at high speeds and had been fleeing arrest for some time, (3) Leija was believed to be intoxicated, (4) Leija had a gun and said he would shoot at any officer he saw, (5) Officer Ducheneaux was below Mullenix's position and in Leija's path, and (6) Trooper Rodriguez was following Leija in his patrol car.

The majority finds Leija's threats to public safety neither immediate nor imminent. So, under the majority's view, when, if ever, is an officer's conduct shielded by qualified immunity except to employ spikes on the highway? Speed is not a compelling factor, if traveling between 85 and 110 miles per hour is not enough. Nor is obvious danger to other motorists, given that Leija (1) passed eight other vehicles, including a passenger bus; (2) passed fifty cars in the oncoming lanes; (3) raced by ten on-ramps to communities unknown; (4) drove recklessly; and (5) was thought to be drunk. Imminent danger from repeated threats to shoot pursuing officers apparently adds nothing. Nor does peril to officers in chase cars or on roadways. Nor does the *collective* weight of these factors impress the majority as a significant danger to the safety of the officers and public.[8]

The panel's contrary conclusion makes it impossible for an officer to understand whether and when his decision to disable a fleeing suspect's car will expose him to personal liability. Through its misunderstanding and misstatement of binding precedent, the panel condones second-guessing of

---

[8] The panel further misunderstands binding precedent of the Supreme Court when the panel requires an immediate threat of harm before force can be used to stop high-speed flight. The Supreme Court expressly stated that there is no "magical on/off switch that triggers rigid preconditions [such as an imminent threat of harm] whenever an officer's actions constitute "deadly force.'" *Scott*, 550 U.S. at 382. Instead, the Court adopted a case-specific test of reasonableness: "[A]ll that matters is whether [an officer's] actions were reasonable." *Id.* at 383.

split-second decisions—in contravention to the principles of qualified immunity.

Finally, the only redeeming aspect of this opinion is that it is such an outlier and so contrary to previous precedents that it can, and will, be dismissed under our strict rule that one panel cannot overrule precedent of earlier opinions. *Ford v. Cimarron Ins. Co.*, 230 F.3d 828, 832 (5th Cir. 2000) ("We are a strict *stare decisis* court. Thus, one panel of this court cannot disregard, much less overrule, the decision of a prior panel." (quotation marks omitted)).

Because our Court is derelict in failing to employ the en banc procedures to rid this outlier from the law books, I respectfully dissent from the decision to deny rehearing en banc.

KING, Circuit Judge, joining Judge Jolly's dissent from the denial of rehearing en banc:

Although I was a member of the panel in this case, I was not consulted when the panel majority decided to vacate its original opinion and to issue a new one. I do not join the new opinion.

As for the merits of the new opinion and the decision of the en banc court to deny rehearing en banc, I join Judge Jolly's opinion. I would point out that other law enforcement officers involved in this event thought it advisable to wait to see if the spikes worked. Mullenix voiced particular concern about Leija's threats to shoot officers and elected to try to shoot out the engine block of Leija's car and thereby end his dangerous flight. That may have been a mistaken judgment; in my view, it was not an unreasonable one. But, as Judge Jolly points out, qualified immunity protects reasonable but mistaken judgments in an emergency situation like this one. As the law now stands, Mullenix was entitled to qualified immunity.